IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 22-3217

UNITED STATES OF AMERICA,
Appellee

v.

MUSTAFA MOUSAB ALOWEMER,
Appellant

Appeal from the judgment entered in the
United States District Court for the
Western District of Pennsylvania at No. 2:19-cr-219

BRIEF FOR APPELLANT

1001 Liberty Avenue                LISA B. FREELAND
Suite 1500                         Federal Public Defender
Pittsburgh, PA 15222
(412) 644-6565                     SAM SAYLOR
                                   Assistant Federal Public Defender
                                   Attorneys for Appellant,
                                   Mustafa Mousab Alowemer

# TABLE OF CONTENTS

TABLE OF CONTENTS ..............................................................................i

TABLE OF AUTHORITIES ....................................................................iii

STATEMENT OF JURISDICTION......................................................1

STATEMENT OF THE ISSUES AND STANDARD OF REVIEW..........2

STATEMENT OF RELATED CASES AND PROCEEDINGS.................3

STATEMENT OF THE CASE ................................................................4

I.     Procedural History .....................................................................4

A.   Charging ......................................................................................4

B.   Plea..............................................................................................4

C.   Sentencing ...................................................................................5

D.   Factual summary .........................................................................6

   1.   Background regarding Mr. Alowemer and his conduct....................6

      a.   Mr. Alowemer's background in Syria and eventual migration to the United States.....................................................7

      b.   FBI investigation .....................................................9

      c.   Interactions with the online OCE. ......................................11

      d.   In-person interactions with the UCE and CHS. .................12

      e.   Arrest of Mr. Alowemer .......................................................20

      f.   Dr. Clarke testified about ISIS generally.............................20

      g.   Mr. Alowemer's trauma induced suggestibility, compliance, and deference to authority.........................................................21

   2.   The district court's justification for application of the terrorism enhancement. ...................................................................23

SUMMARY OF ARGUMENT ................................................................26

ARGUMENT ........................................................................................27

I.   Legal Background...........................................................................27

A.   Specific intent is required ............................................................28

B.   The target of the offense must be objectively government conduct .29

II.  Mr. Alowemer's offense was not calculated to influence or affect the conduct of any government. ............................................................... 33

A.  The calculated purpose of the plot was to attack a "polytheist" Christian church for religious reasons. ............................................ 40

1.  The district court improperly conflated Mr. Alowemer's calculation with the goals of ISIS as an organization. .................................... 42

B.  The plot was not calculated to influence or affect the city of Pittsburgh nor the Pittsburgh police. .............................................. 44

C.  Mr. Alowemer plotted to attack a church to intimidate a Christian civilian population, not to influence government conduct. ........... 48

D.  The plot to attack a Christian church in the United States was not calculated to influence or affect the Nigerian government. .......... 51

III.  The offense was not calculated to retaliate against the conduct of any government. ................................................................................ 53

IV.  The district court failed to consider evidence that Mr. Alowemer's PTSD made him vulnerable to suggestion and compliance with the undercover agents and more likely to defer to their authority. .... 62

CONCLUSION ........................................................................................ 68

CERTIFICATE OF MEMBERSHIP IN BAR ........................................ 69

CERTIFICATE PURSUANT TO FEDERAL RULE OF ........................ 69

APPELLATE PROCEDURE 32(a)(7)(C) ................................................ 69

CERTIFICATE OF IDENTICAL TEXT .............................................. 69

CERTIFICATE OF VIRUS CHECK ...................................................... 70

CERTIFICATE OF SERVICE ................................................................ 71

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Duncan v. Walker*, 533 U.S. 167 (2001) ................................................ 33

*Holder v. Humanitarian Law Project*, 561 U.S. (2010) ........................ 45

*United States v. Alhaggagi*, 978 F.3d 693 (9th Cir. 2020) .. 29, 30, 44, 54

*United States v. Ali*, 799 F.3d 1008 (8th Cir. 2015) .............................. 30

*United States v. Ansberry*, 976 F.3d 1108 (10th Cir. 2020) ............ 31, 32

*United States v. Awan*, 607 F.3d 306 (2d Cir. 2010) ........... 28, 29, 35, 62

*United States v. Chandia*, 514 F.3d 365 (4th Cir. 2008) ...................... 52

*United States v. Dye*, 538 Fed. Appx. 654 (6th Cir. 2013) ................... 54

*United States v. Gray*, 942 F.3d 627 (3d Cir. 2019) ............................... 3

*United States v. Jordi*, 418 F.3d 1212 (11th Cir. 2005) ....................... 34

*United States v. Harris*, 434 F.3d 767 (5th Cir. 2005) .................... 47-48

*United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011) ................. 41

*United States v. Khatallah*, 314 F. Supp. 3d 179 (D.D.C. 2018) ..... 36-37

*United States v. Mandhai*, 375 F.3d 1243 (11th Cir. 2004) ............ 35, 48

*United States v. McDavid*, 396 Fed. Appx. 365 (9th Cir. 2010) ........... 37

*United States v. Salim*, 549 F.3d 67 (2d Cir. 2008) ........................ 54-55

*United States v. Siddiqui*, 699 F.3d 609 (2d Cir. 2012) .................. 30, 31

*United States v. Stafford*, 782 F.3d 786 (6th Cir. 2015) ...................... 37

*United States v. Stein*, 985 F.3d 1254 (10th Cir. 2021) ............ 35, 38, 39

*United States v. Thurston*, CR-06-60069-01-AA, et al., 2007 WL 1500176 at *15 (D. Or. May 21, 2007) ....................................................... 31

*United States v. Van Haften*, 881 F.3d 543 (7th Cir. 2018) ................. 54

*United States v. Wise*, 515 F.3d 207 (3d Cir. 2008) ............................... 3

*United States v. Wright*, 747 F.3d 399 (6th Cir. 2014) .................. 30, 35

## FEDERAL STATUTES

18 U.S.C. § 249 ........................................................................ 32

18 U.S.C. § 842 .......................................................................... 5

18 U.S.C. § 2332b ............................................................... Passim

18 U.S.C. § 2339B ............................................................... Passim

## OTHER AUTHORITIES

George D. Brown, Punishing Terrorists: Congress, the Sentencing
    Commission, the Guidelines, and the Courts, 23 Cornell J.L. &
    Pub. Pol'y 517 (2014) ....................................................... 28

U.S.S.G. Amendment 637 ...................................................... 51

U.S.S.G. Amendment 637, App. C ......................................... 51

U.S.S.G. § 2M5.3 ...................................................................... 6

U.S.S.G. § 3A1.1 .................................................................... 32

U.S.S.G. § 3A1.4 ............................................................... Passim

U.S.S.G. § 3A1.4, cmt. 4 ............................................. 33, 50, 51

## STATEMENT OF JURISDICTION

This is an appeal from a judgment imposed in the United States District Court for the Western District of Pennsylvania at Criminal Action No. 2:19-cr-219.

Jurisdiction in the district court was conferred by 18 U.S.C. § 3231. Sentence was imposed on November 8, 2022. Appx 1-9. Mr. Alowemer's notice of appeal was filed on November 22, 2022 and was timely under Rule of Appellate Procedure 4(b)(1)(A). Appx 10. This Court has appellate jurisdiction under 28 U.S.C. §§ 1291 and 3742.

## STATEMENT OF THE ISSUES AND STANDARD OF REVIEW

I.    Did the district court err in applying a twelve level "terrorism" enhancement in this case?

<u>Preservation of this issue</u>: Via a written plea agreement, Mr. Alowemer reserved his right to appeal the imposition of the terrorism enhancement in this case. Appx 1039. This issue was preserved orally at Mr. Alowemer's sentencing hearing. Appx 893-894.

<u>Standard of Review</u>: This Court reviews a district court's interpretation and application of the Sentencing Guidelines *de novo* and reviews the district court's factual findings for clear error. *See United States v. Wise*, 515 F.3d 207, 217 (3d Cir. 2008); *United States v. Gray*, 942 F.3d 627, 630-31 (3d Cir. 2019).

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not been before this Court previously. There are no related cases or proceedings.

## STATEMENT OF THE CASE

## I.    Procedural History

### A.    Charging

Mustafa Alowemer was initially charged via criminal complaint on June 18, 2019 with one count of violating 18 U.S.C. § 2339B(a)(1), attempting to provide material support and resources to a Foreign Terrorist Organization ("FTO") (Count 1) and two counts of violation 18 U.S.C. § 842(p)(2)(B), distribution of information relating to explosives, destructive devices, and weapons of mass destruction (Counts 2 and 3). Appx 30.

### B.    Plea

On September 16, 2021, Mr. Alowemer pled guilty to Count 1. In conjunction with his plea, the government agreed to dismiss Counts 2 and 3.

The plea agreement contained a waiver of many of Mr. Alowemer's appeals rights, with some exceptions. Of most relevance here, the plea agreement contained a provision permitting Mr. Alowemer to take a direct appeal from his sentence related to the application of the terrorism sentencing enhancement. Appx 1039.

### C.     Sentencing

The district court conducted a two-day sentencing hearing across November 4 and 8, 2022. At the first session on November 4, 2022, the district court heard from two witnesses: Special Agent Nicholas Edquist testified about Mr. Alowemer's communications with undercover agents purporting to be members of ISIS and Dr. Colin Clarke testified generally about ISIS as an organization. At the conclusion of the November 4, 2022 hearing, the court found the "terrorism enhancement" under U.S.S.G. § 3A1.4 applied.

On November 8, 2022, the district court heard from Mr. Alowemer's sister Shahid Alowemer, his teacher Christine Tapu, and Dr. Lucy Guarnera, PhD. Mr. Alowemer himself made a statement taking responsibility and expressing remorse for his actions. Appx 874-876.

The base offense level for attempted material support of a terrorist organization was 26. U.S.S.G. § 2M5.3. Because the district court found the terrorism enhancement applied, the base offense level was increased by 12 levels with an eventual adjusted offense level of 37. Mr. Alowemer had no prior criminal history. However, the terrorism

enhancement required automatic application of Category VI. The resulting guideline range was 360 months to life imprisonment. As the statutory maximum for Count one was 240 months, the guideline range was 240 months.

At the conclusion of the November 8, 2022, the district court sentenced Mr. Alowemer to 208 months imprisonment on Count 1 and supervised release for the remainder of Mr. Alowemer's life. Appx 888.

### D.    Factual summary

### 1. Background regarding Mr. Alowemer and his conduct.

Sentencing memoranda filed in the district court set forth the factual background of this case. *See* Appx 267-444.

The defense memorandum included expert reports. Dr. Guarnera, Ph.D., conducted a forensic evaluation of Mr. Alowemer, and diagnosed him with PTSD, Complex PTSD, and major depressive disorder. Report at 45. Dr. Guarnera testified that Mr. Alowemer had the most severe trauma history of anyone she had ever evaluated 11/8 at 80-81. In his report, Dr. Steven Weine, M.D., opined that the online environments established by ISIS invited the psychologically vulnerable Mr.

Alowemer into making decisions that he would have been unlikely to make otherwise.

### a. Mr. Alowemer's background in Syria and eventual migration to the United States.

Mr. Alowemer grew up in Syria. When he was 12 years old, the Syrian Civil War erupted. Da'ara, Syrian, his hometown, was a flashpoint of the war. Soon after the conflict started, soldiers came to his home, threatened him and his family at gun point, and shattered his father's leg. For years, young Mustafa Alowemer saw the Syrian soldiers brutalize himself, his family, and his neighbors. The soldiers purposefully polluted the water, shot at them as they crossed the street, and violently interrogated them.

In 2013, the Alowemers made the decision to flee their homeland for a refugee camp in Jordan. Mr. Alowemer was 14 years old. The family survived on small rations and walked long distances to obtain water. Because his father was unable to obtain work, teenage Mr. Alowemer had to provide for the family, working with hazardous chemicals in a leather factory and lifting heavy objects in a construction facility. Appx 703-704. In Jordan, Mr. Alowemer's family first noticed posttraumatic symptoms from all that he had witnessed in Syria. He

reported to Dr. Guarnera that while in Syria he felt "numb" and under "constant threat;" in Jordan he began having flashbacks, mood changes, and sleep disturbance. Appx 906.

In 2016, when Mr. Alowemer was 19, he and his family were granted asylum in the United States and were resettled in the Northview Heights neighborhood of Pittsburgh. He enrolled in high school for the first time in his life. In May 2019, at age 21, Mr. Alowemer graduated high school.

Yet Mr. Alowemer struggled to fully adapt. Christine Tapu – Mr. Aowemer's high school ESL teacher – observed his survivor's guilt. He asked her "why am I not one of those people who are in Syria on the news dead on the ground?" Appx 737. Ms. Tapu and Mr. Alowemer's sister, Shahid, testified to a particular incident at school on February 12, 2019, where Mr. Alowemer expressed suicidal thoughts while in class. Appx 733-737. These suicidal ideations came soon after Mr. Alowemer learned that cousins and friends had been killed in Syria one of whom was shot in the head while covering the conflict as a journalist. Appx 910.

### b. FBI investigation.

Less than a month after he expressed thoughts of self-harm, FBI agents made their first contact with Mr. Alowemer by having an online covert employee ("OCE") Facebook friend request him on March 8, 2019. For approximately four months, the FBI had been monitoring Mr. Alowemer's online activity because he had attempted to communicate via Facebook with a known ISIS supporter. Appx 486.

As recounted to Dr. Guarnera, Mr. Alowemer explained that he began accessing ISIS-associated social media because the people depicted on those sites "appeared to care deeply about helping Syrians …." Mr. Alowemer blamed himself for surviving the war, and he consumed the ISIS propaganda as a way to change the suffering of people in Syria. Appx 768.

Of particular relevance to the application of the terrorism enhancement in this case are Mr. Alowemer's posts on April 15, 2018 – one year before any contact with the FBI – because they show that his animus is based in religious difference. The Facebook user under investigation posted a link to a video with the following description translated by an FBI linguist: "Sufis in Nigeria are climbing a lamp

9

post to be blessed from. The face of their deceased Sheikh Ibrahim Inyass is allegedly seen coming out from the light." Mr. Alowemer's comment on the post and the subsequent responses, as translated by the FBI linguist, demonstrated anger at the Nigerians based on their religious views and behaviors. Appx 1025.

> Mr. Alowemer: "God curse them. Fucking stupid people what the fuck they think."
>
> FB User: "watch your language Brother please."
>
> Mr. Alowemer: "I am sorry brother but I didn't control myself when I see those people really doing that.
>
> Mr. Alowemer: "I am sorry."
>
> FB User: "It's ok no problem, they are pathetic to say the least."
>
> FB User: "They are worse than the people who where [sic] gathering around the virgin mary statue cuz they claimed it was crying."
>
> Mr. Alowemer: "that's right."
>
> Mr. Alowemer: "May God reward you brother."

Other Facebook comments by Mr. Alowemer referenced in Agent Edquist's affidavit all show short unemotional responses such as "in God's will," and "There is no God but God" and "Muhammad is God's messenger." Appx 1024.

### c. Interactions with the online OCE.

The OCE portrayed himself as an ISIS member who lived in Europe. Appx 486. For approximately 5 weeks, the two spoke about their lives, their disgust with Shi'a Islam and other religious groups, and their support of ISIS. During this time, Mr. Alowemer's mental health symptoms worsened. Appx 911.

The OCE initially told Mr. Alowemer that he would help him travel to Syria. In exchange, Mr. Alowemer noted that he would give information about possible targets to the OCE.

Mr. Alowemer offered information to the OCE about members of the Yazidi community known to him in Pittsburgh to target for a possible attack. Appx 491.[1]

In the course of over a month of conversations between the OCE and Mr. Alowemer, the OCE also suggested on multiple occasions that Mr. Alowemer make a Bay'aa video (a pledge of allegiance to ISIS). ST at 83. The OCE stated that Mr. Alowemer must make a Bay'aa video in order to move forward with any further contact.

---

[1] No plan to attack Yazidis was formulated.

A few days later, Mr. Alowemer messaged the OCE to say that his home had been "raided by police" and that his computer and all his devices had been taken. Appx 543. Agent Edquist testified that there was no police raid of the Alowemer home – Mr. Alowemer lied to the OCE. Appx 545.

A few days after this lie, Mr. Alowemer reinitiated contact, and transmitted a Bay'aa video. In return, the OCE sent him the contact information for a local "brother," who was actually an undercover covert employee ("UCE"). On April 16, 2019, Mustafa met with the UCE in Pittsburgh.

### d. In-person interactions with the UCE and CHS.

Mustafa met with the UCE on five occasions: April 16, April 25, June 2, June 11, and June 19, 2019. During the time period of these meetings, Mr. Alowemer and the undercover agents were in frequent communication via text message. As was the case with the OCE, conversations between the UCE and Mustafa revolved around what it meant to be a good Muslim and religious grievances against "apostates" (Shi'ite Muslims) and "nonbelievers" (other religions).  In these

conversations, the UCE often complimented Mustafa on the strength of his religious faith. Appx 308.

In their first meeting, on April 16, 2019, Mr. Alowemer and the UCE and a Confidential Human Source ("CHS") met. At first Mr. Alowemer was ready to give information. But eventually the UCE and CHS emphasized the need for action. Per the UCE, if anyone was not serious "then that Moslem needs to leave" and "there is no point for anyone to be at this table" without violent action. Appx 581. In response, Mustafa bragged that while he was in Syria he destroyed a Minaret because it had an "unbeliever" Christian in it.[2] Appx 309. Mr. Alowemer also mentioned to the UCE that he saw a United States military servicemen in a forest and that , if he had had a weapon at the time, he would have killed the serviceman because of what the U.S. military was doing to his brothers in Baghuz. Appx 493.[3]

However, in these conversations, Mr. Alowemer also admitted to the UCE and CHS, "I will do anything you tell me currently because

---

[2] There is no evidence that Mustafa's claim about destroying a Minaret is anything but an exaggeration.

[3] As part of his testimony, *see below*, Dr. Colin Clarke noted that Al Baghuz was the final battle between ISIS and a United States-led military operation in Syria. Appx 629.

truthfully I don't know anything," he had "never used a weapon," and he had no knowledge "about creating bombs and stuff like this." Appx 604-605.

The undercover agents turned the conversation to the subject of each person's "roles" in the group. The UCE said he was an expert at making explosives. Appx 532. The CHS portrayed himself as someone with expertise in international money transfers to assist ISIS. Appx 532-533. The UCE introduced coded language involving "cooking" to signal they were talking about explosives and referred to himself as a "lion in the kitchen." The UCE and CHS encouraged Mustafa's role to that of gathering information about a possible target: "we rely upon you (Mustafa) getting the information so we know it is a good target or a bad target." Appx 309. The agents underscored Mustafa's information gathering abilities: "you were looking for all the right things, all the proper things." Appx 308.

On April 25, 2019, the agents and Mustafa met for a second time. Prior to this meeting Mr. Alowemer canvassed a mosque with Shi'ite worshippers as a possible target. Appx 309. However, the mosque was ruled out as a target because Sunnis might be harmed. At this meeting,

Mr. Alowemer showed the undercover agents a video depicting a torn United States flag, the White House burning, and ISIS militants raising a black ISIS flag. Appx 496. Also at this meeting, Mr. Alowemer sang a "nasheed" – an acapella poem portraying fundamentalist religious ideology. Appx 560-561.

After the second meeting, Mr. Alowemer electronically sent instructional materials on homemade explosives to the UCE. Appx 502.

At a June 2, 2019 third meeting with UCE, Mr. Alowemer talked about the proposed plot to blow up a church on the Northside of Pittsburgh. ST at 11. Mr. Alowemer said to the UCE that he believed Nigerian people attended the church. Appx 484.

The following exchange is about why the Legacy International Worship Center is selected as the target. The government's case for imposition of the "terrorism enhancement" in this case rests primarily on this exchange. Appx 971.

| MA: | *And the – uh, this house is still for the ones who go to church because they are Nigerians. [UI]* |
| UCE: | Yeah. So, why the Nigerians? All of them are polytheists. |
| MA: | They are all polytheists. *We, we, take revenge for our brothers in Nigeria.* |
| UCE: | There is an Islamic State or there was an Islamic State in Nigeria. |
| MA: | Of course there is [UI] |
| UCE: | Boko Haram? |
| MA: | *Boko Haram. It doesn't – it did not pledge fealty brother.* |
| UCE: | Of course it did. |
| MA: | *Not always.* |
| UCE: | OK. |
| MA: | *I am not sure about this. And uh, I will Inshallah – they all uh. They all were pious. But thank God [UI] Abu Walid Al Filastini is the leader of ISIS and God willing he will start doing things to the French* |

At the sentencing hearing, the government presented screenshots from Mr. Alowemer's phone depicting news articles and headlines about ISIS activities in Africa. Appx 507-508 and Appx 1003-1009. While these images were located on Mr. Alowemer's phone, it was not forensically known whether the images were actively downloaded or automatically downloaded as part of being a member of a particular WhatsApp group. Appx 564-565.

When discussing timing about when the explosive would be planted, the UCE told Mr. Alowemer that common worship time is at 11:00 a.m. on Sunday morning. Appx 515. Mr. Alowemer said that the

16

explosives should be set early in the morning, around 3:00 a.m. Appx 584.

To this, the UCE asked Mustafa if he wanted to harm the "polytheist Christians" in the church or if he just wanted to burn the building. Appx 585. Mustafa replied he does not know and he will need more time to think about the answer. *Id*. When the UCE circled back to whether Mr. Alowemer wanted to destroy the church or cause killing, Mr. Alowemer said that he doesn't "think there's going to be people in [the church]." Appx 586-587.

The UCE also mentioned that some people who are inside the church or in a nearby building might die from an incendiary device that causes fire. Mr. Alowemer replied that he did not believe that people resided in the houses next to the church. Appx 970. Ultimately, when pressed by the UCE about what he wanted to accomplish, Mr. Alowemer said that he just wants to destroy and burn the church, rather than kill. Appx 594.

When discussing whether planting explosives at the church would cause harm to people living in houses around the church, Mr. Alowemer told the UCE and CHS that he had surveilled the area. At times, Mr.

17

Alowemer said there were people living near the church. But in other conversations he said there was nobody living nearby. As testified by Agent Edquist, Mr. Alowemer often "was using conflicting information" when he spoke to the UCE and CHS. Appx 515.[4]

Also, during this meeting, Mr. Alowemer and the undercover agents discuss potentially utilizing a second bomb after the first bomb goes off when first responders were on the scene. At the subsequent fourth and fifth meetings, Mr. Alowemer disavows this plan and says to the UCE and CHS that a second bomb should not be utilized. Appx 593-594.

While there were early communications where Mr. Alowemer alluded to dying as a martyr, Mr. Alowemer also expressed concern that any explosives would "put our lives at risk." Appx 966.

Also at the third meeting, the CHS – the explosives expert – listed items that are necessary to make a homemade bomb. Between the third and fourth meetings, Mr. Alowemer bought some of those items,

---

[4] At argument on November 8, 2022, the attorney for the government noted that Mr. Alowemer was inconsistent when communicating with the undercover agents: "it's simply impossible to know which statement at which particular point in time [Mr. Alowemer] wants to adhere to." Appx 822-823.

including acetone, nails, ice packs, and batteries. Appx 511-512. Between the third and fourth meeting Mr. Alowemer also wrote up operational guidelines for the church plot – including time, place, and equipment needed. Appx 513.

During the fourth meeting on June 11, Mr. Alowemer, the UCE, and the CHS drove to the site of the church and discussed the plan in greater detail, including how to avoid detection from law enforcement. At this fourth meeting, Mr. Alowemer discussed with the UCE and CHS potentially leaving an ISIS flag including the words "we have arrived" to claim credit for the attack on behalf of ISIS. Appx 511. However, at this meeting, Mr. Alowemer withdrew his support for any communication that the attack was done in the name of ISIS: "we don't have to say that we're ISIS. We'll stay quiet." Appx 595.

At the last meeting on June 19, Mr. Alowemer discussed the possibility that there may be others in the United States that were sympathetic to ISIS and that their attacks may inspire those individuals. Appx 518. He was arrested shortly thereafter.

### e. Arrest of Mr. Alowemer.

Upon his arrest in this case, Mustafa asked FBI agents if they were going to kill him. In his post-arrest interview, Mr. Alowemer acknowledged his role in the plot and that he was doing something wrong.

To FBI interviewers Mr. Alowemer expressed his "profound sadness" about what was going on in the Middle East and his "animosity towards multiple governments including potentially the United States." Appx 520.

### f. Dr. Clarke testified about ISIS generally.

Dr. Colin Clarke, a security and intelligence consultant, testified regarding the activities of ISIS generally.

Dr. Clarke testified that the goal of ISIS was to reestablish a caliphate and it is "very difficult to disaggregate religious and political" with ISIS. Appx 613-614; Appx 622. Churches are often the target of attacks for ISIS generally. Appx 628. ISIS members would claim credit for their attacks by leaving a symbol or message at the site of the attack. Appx 621.

Regarding ISIS and Africa, Dr. Clarke noted that in 2019, ISIS was focusing its military and propaganda attention on Africa. The United States and Nigeria were part of the coalition of nations battling ISIS in Africa. Appx 624. Dr. Clarke also explained that in 2018-2019 there was a "fissure" between Boko Haram, ISIS, and Al Qaeda in Africa. Appx 625. There was "a lot of uncertainty" about the loyalties of these groups in Africa. The internecine conflict between the groups is so complicated there are "books written" about the subject. Appx 625.

### g. Mr. Alowemer's trauma induced suggestibility, compliance, and deference to authority.

Dr. Guanera – via her report attached to defendant's sentencing memorandum and her testimony – concluded that as a result of his prolonged exposures to threat and deprivation during the Syrian civil war and subsequent years as a refugee in Jordan, Mr. Alowemer suffered from PTSD, complex PTSD, and major depressive disorder. Appx 748; Appx 941. This trauma was retriggered when he saw images from Syria and learned of the deaths of people he knew in Syria. Appx 757-758. Dr. Guanera wrote that it was "not surprising that Mr. Alowemer began making risky, ill-advised decisions to converse and

21

meet with individuals allegedly involved in terrorist activities only *after* [the February 12, 2019] acute emotional crisis." Appx 932.

Most relevant to the application of the terrorism enhancement, Dr. Guanera opined that Mr. Alowemer's trauma-induced brain changes made him more suggestible and compliant to the words of the undercover agents and to defer to their authority. Appx 935-940.

As an adolescent with a serious trauma history, Mr. Alowemer was particularly vulnerable to defer to individuals he considered to be authority figures. Mr. Alowemer referred to himself as the younger brother to the OCE. Appx 939. Mr. Alowemer told the agents: "If you were not here, we wouldn't be do[ing] anything". Appx 940.

For example, while Mr. Alowemer seemed to agree to take action, he consistently made abstract commitments to violent action. Regarding potential targets, he first proposed providing information about a Yazidi festival in Canada hundreds of miles away, then a festival that wouldn't take place for another year. At the second meeting, Mr. Alowemer proposed a Shia mosque site for an attack, but then vetoed it within the same meeting. Appx 76.

During the third meeting, Mr. Alowemer was asked by the UCE whether he wanted to "get the Mushrikeen [Christians]" or "just burn the building." Mr. Alowemer delayed committing to violence against people. Later, in the same meeting Mr. Alowemer said he just wanted to bomb the church at 3AM and stated that he doesn't think there would be people in the church or in the surrounding area at that time. Appx 938. In that same meeting, he also withdrew his plan for a second bomb, saying he just wanted to destroy the church. As noted by Dr. Guarnera, Mr. Alowemer appeared – as best he could – to be complying with the stated preferences of the undercover agent (whom he saw as authority figures) while maintaining a plan that would minimize impact on human life. Appx 939.

Dr. Guarnera concluded that given his trauma history and age at the time of the offense, Mustafa was "neurodevelopmentally primed to comply with individuals he viewed as authority figures." Appx 940.

### 2. The district court's justification for application of the terrorism enhancement.

The district court found the terrorism enhancement applied. According to the court, Mr. Alowemer "had the specific intent to commit an offense calculated to influence or affect the conduct of government by

intimidation or coercion or to retaliate against government conduct."
Appx 665. As to this specific intent requirement, the district court noted
that the "focus is not on the motive of the defendant but on his offense
and whether it was calculated, planned for whatever reason or motive,
to achieve the stated object." Appx 665.

The district court found the following (quotes are from the district
court). Per the court, Mr. Alowemer:

- was motivated to support the cause of ISIS. Appx 666.

- wanted to inspire ISIS sympathizers to commit similar acts. Appx 666.

- wanted to "take revenge for, quote, our ISIS brothers in Nigeria, end quote."[5] Appx 667.

- expressed hope that he would die as a suicide bomber. The district court added that this was not applicable to the plotting towards this conduct, but it "does go to the circumstances . . . in relation to his intentions in the actions at issue in this case." Appx 667.

- was willing to assist in avenging "our brothers" against ethnic Kurdish Yazidis" by identifying local Yazidis as targets. In conjunction with this, the court noted that Kurdish Syrians, with the support of the United States, ultimately defeated ISIS in Al Baghuz, a city in Eastern Syria. Appx 667.[6]

---

[5] The district court's inaccurately includes "ISIS" here. Mr. Alowemer actually wrote to the UCE: "They are all polytheists. We, we take revenge for our brothers in Nigeria." Appx 971.

[6] No Yazidis were targeted as part of the plotting with the undercover agents.

- expressed hope that destroying the church would inspire other brothers in the United States to join together and take similar action. Appx 668.

- "raised the possibility" of setting a second delayed explosive timed to explode when first responders were on the scene. However, the district court acknowledged that the second delayed explosive was abandoned by Mr. Alowemer. Appx 668.

- was told by the undercover agent that destroying the church might require explosive force enough to result in death and injury to other people. However, the court also acknowledged that Mr. Alowemer voiced his own belief to the undercover agents that no persons would be in the area of the blast early in the morning and there was little risk of injury. Appx 668.

- suggested that they leave an ISIS-related flag to claim credit for the attack. The court acknowledged that Mr. Alowemer withdrew his support for leaving a flag to claim credit for the attack. Appx 668-669.

- wanted to plant the bomb early morning on a Sunday to instill fear against religious practitioners going to church on Sunday. Appx 669.

- desired to travel back to Syria to conduct jihad with ISIS. Appx 669.

- pledged support to Al-Baghdadi, the then-leader of ISIS. Appx 669.

- told the undercover agents that he saw a United States soldier in a forest near Pittsburgh and wanted to target him because the United States military had killed ISIS members in Baghuz and Iraq. Appx 670.

## SUMMARY OF ARGUMENT

The district court erred in applying the terrorism enhancement. The enhancement requires 1) Mr. Alowemer subjectively calculated that his offense would influence, affect, or retaliate against government conduct, and 2) the targeted conduct was itself objectively government conduct. Neither are true. Mr. Alowemer did not plot against government conduct, did not intend for a specific governmental outcome as a result of his plot, and did not retaliate against government conduct. Rather, the evidence shows that Mr. Alowemer's plot against a church was calculated against non-governmental conduct; civilian, Christians were targeted for religious animus reasons.

Furthermore, the district court improperly disregarded mental health evidence when evaluating Mr. Alowemer's statements to undercover agents. It was error for the district court to consider his statements as they relate to what he calculated with respect to his offense yet ignore the evidence that his PTSD caused him to be suggestible to, compliant with, and to defer to the authority of the undercover agents.

# ARGUMENT

## I.    Legal Background

When the U.S.S.G. § 3A1.4 "terrorism enhancement" is applied, it

"takes a wrecking ball" to the initial Guidelines range. George D.

Brown, *Punishing Terrorists: Congress, the Sentencing Commission, the*

*Guidelines, and the Courts*, 23 Cornell J.L. & Pub. Pol'y 517, 520 (2014).

Its imposition results in a 12-level offense level increase. The terrorism

enhancement also requires automatic application of criminal history

Category VI, regardless of the defendant's prior criminality. Because of

these steep increases, it does not automatically apply. U.S.S.G. § 3A1.4

is only satisfied if the offense: (1) "involved" a crime of terrorism, or (2)

was "intended to promote" a crime of terrorism. *See United States v.*

*Awan*, 607 F.3d 306, 311 (2d Cir. 2010).[7]

A "federal crime of terrorism" has the meaning given that term in

18 U.S.C. § 2332b(g)(5), which defines a "federal crime of terrorism" as

"an offense that (A) is calculated to influence or affect the conduct of

government by intimidation or coercion, or to retaliate against

---

[7] This Court has not had the opportunity to rule on a case involving the application of U.S.S.G. § 3A1.4.

government conduct; and (B) is a violation of [the enumerated statutes]."

Both parts (A) and (B) must be satisfied for the terrorism enhancement to apply. The offense to which Mr. Alowemer pled guilty, 18 U.S.C. § 2339B(a)(1), is one of the enumerated statutes and part (B) is satisfied.[8] Therefore, for the terrorism enhancement to apply, Mr. Alowemer's offense must have "involved" actions that were "calculated" either to "influence or affect the conduct of government by intimidation or coercion" or to "retaliate against government conduct." *United States v. Alhaggagi*, 978 F.3d 693, 699-700 (9th Cir. 2020).

## A. Specific intent is required.

Part (A) of § 2332b(g)(5) can be broken down further. "'Calculation' is concerned with the object that the actor seeks to achieve through planning or contrivance." *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010). The focus is not "on the defendant, but on his 'offense'." *Id*. The question is whether the "underlying felony [be] calculated to

---

[8] § 2339B(a)(1) prohibits knowingly providing material support or resources to a foreign terrorist organization.

influence or affect the conduct of government . . . or retaliate against government conduct." *Id*.

Other circuit courts have likened "calculation" to a "specific intent" requirement. *See e.g.*, *United States v. Alhaggagi*, 978 F.3d 693, 699-700 (9th Cir. 2020) ("The parties agree, consistent with the district court's decision and those of our sister circuits that have addressed the issue, that § 2332b(g)(5)(A) imposes a specific intent requirement."); *United States v. Wright*, 747 F.3d 399, 408 (6th Cir. 2014) (collecting cases); *United States v. Siddiqui*, 699 F.3d 609, 709 (2d Cir. 2012) (same). Here, the district court noted that Mr. Alowemer must have the "requisite intent necessary . . . beyond the intent required to establish a violation of the material support statute." Appx 664.

In other words, it must be shown the defendant provided material support "with the purpose of influencing or affecting [or retaliating against] government conduct and planned his or her action with this objective in mind." *United States v. Wright*, 747 F.3d 399, 407 (6th Cir. 2014). The relevant question is "whether [the offense] was calculated, i.e., planned – for whatever reason or motive – to achieve the stated object." *United States v. Ali*, 799 F.3d 1008, 1031 (8th Cir. 2015). "'If a

defendant's *purpose* in committing an offense is to 'influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct,' application of the terrorism enhancement is warranted." *United States v. Siddiqui*, 699 F.3d 709 (2d Cir. 2012) (quoting *United States v. Stewart*, 590 F.3d 93, 137 (2d Cir. 2009)).

## B.   The target of the offense must be objectively government conduct.

In addition, the target of the crime must be objectively government conduct. § 2332b(g)(5)(A) defines "federal crime of terrorism" as an offense that is intended to influence or affect the *conduct of government* or to retaliate against *government conduct*. 18 U.S.C. § 2332b(g)(5)(A) (emphasis added). "The government must establish that the defendants targeted government conduct rather than the conduct of private individuals or corporations." *United States v. Thurston*, CR-06-60069-01-AA, et al., 2007 WL 1500176 at *15 (D. Or. May 21, 2007).

The Tenth Circuit in *United States v. Ansberry*, 976 F.3d 1108, 1127-28 (10th Cir. 2020) analyzed § 2332b(b)(5)(A) and found that the ordinary meaning of the statute language requires the offense be

calculated to retaliate against government conduct, objectively defined.[9]

"We think the term 'government conduct,' in conjunction with the rest of

the statute, is most naturally read to mean conduct by government in

the objective sense rather than to mean any kind of conduct – *even non-*

*government conduct* – that a defendant believes to be conduct by

government." *Ansberry*, 976 F.3d at 1128 (emphasis in original).

The wording of § 2332b(b)(5)(A) supports the same conclusion.

Congress could have chosen to impose liability for a defendant's

subjective beliefs about what is government conduct. Other statutes

criminalize certain acts taken "because of actual or perceived race,

color, religion, or national orgin of any person." 18 U.S.C. § 249(a)(1)

(Hate Crimes Acts). So too with the Sentencing Commission. *See*

U.S.S.G. § 3A1.1(a) (hate crime enhancement applies when the

defendant commits certain acts "because of actual or perceived race,

color, religion, etc. of the victim.). If Congress or the Sentencing

commission had intended for the terrorism guideline to apply whenever

the defendant committed offenses against what he subjectively believed

---

[9] At issue in *Ansberry* was the "retaliation" prong of § 2332b(g)(5).

to be government conduct, they would have drafted the statute accordingly.

Requiring that a government-related objective be the purpose of the underlying crime is also bolstered by the text of the terrorism enhancement guideline commentary. Application Note 4 provides for an upward departure for a relevant offense where the defendant's "motive was to intimidate or coerce a civilian population, rather than to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. § 3A1.4, cmt. 4. Note 4's language contemplates that the terrorism enhancement is limited to offenses where the motivation is government-related rather than civilian related. To read § 3A1.4 to cover conduct that is unrelated to government would violate a cardinal rule of statutory construction. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("We are thus reluctant to treat statutory terms as surplusage in any setting.) (internal quotation marks omitted). Indeed, there would be no reason for the Sentencing Commission to provide an upward departure for offenses concerning the targeting of non-governmental "civilian population," if such offenses were already covered by the language of the guideline.

For example, in *United States v. Jordi*, the terrorism enhancement did not apply to a defendant who attempted to destroy abortion clinics using explosives and wanted to create fear amongst abortion provider staff, but the defendant was eligible for this upward enhancement because of his efforts to intimidate a civilian abortion provider population. 418 F.3d 1212 (11th Cir. 2005).

Therefore, upon synthesis of the above, in order for the terrorism enhancement to apply in this case: 1) Mr. Alowemer must have subjectively calculated his offense would influence, affect, or retaliate against government conduct; and 2) the targeted conduct itself was objectively government conduct.

Mr. Alowemer's offense conduct here fails both prongs as outlined above. Mr. Alowemer did not subjectively calculate that his plot with undercover agents to plant explosives at a church in North Pittsburgh would influence or affect government conduct. And relatedly, civilian – rather than government – conduct was targeted. The district court failed to evaluate Mr. Alowemer's case using these principles and erred when it applied the terrorism enhancement to Mr. Alowemer's offense.

## II.  Mr. Alowemer's offense was not calculated to influence or affect the conduct of any government.

Mr. Alowemer did not specifically intend to influence or affect government conduct for a specific goal or purpose beyond generally supporting ISIS. Courts that have applied the enhancement typically look for proof of a specific goal or outcome. *See e.g.*, *United States v. Stein*, 985 F.3d 1254 (10th Cir. 2021) (applying enhancement where defendants plotted to target Muslims and specifically demanded United States government changes to its border policy vis-a-vis Muslims); *United States v. Wright*, 747 F.3d 399, 409 (6th Cir. 2014) (upholding enhancement where defendant had a specific interest in attacking police officers at NATO and G8 summits in Chicago); *United States v. Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004) (upholding application of terrorism enhancement where defendant admitted he was planning to blow up electrical sites and then demand United States release of Muslim prisoners).

As stated above, the relevant inquiry should be what is the "object the actor seeks to achieve through planning or contrivance." *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010). Indeed, the government took a similar position in a pre-sentencing filing: "in applying the enhancement in § 3A1.4, courts have cautioned against

34

conflating of personal motive and calculation towards a *specific outcome*." Appx 260 (emphasis added). Here the object of Mr. Alowemer's offense was to plot against the worship center of a discrete civilian population – whom he derogatorily described multiple times in conversation with the undercover agents as "polytheist Christians" – for religious reasons. Religious animus and bringing fear to polytheist Christians was the "object" the offense was calculated to achieve.

This object can be seen by this choice of religious site as target. Rather than aim for the seat of government (United States or otherwise), a government-related building, or any government property (and therefore directly influence the conduct of that government), Mr. Alowemer chose private, non-governmental property, a church.

In cases similar to Mr. Alowemer's, where there is discussion of an attack plot (usually between a defendant and undercover agents), courts have found the terrorism enhancement applied to offense conduct where government property is targeted. *See United States v. Khatallah*, 314 F. Supp. 3d 179, 199 (D.D.C. 2018) ("several courts [which] have applied and upheld the terrorism enhancement for defendants who targeted government facilities"); *United States v. Stafford*, 782 F.3d 786, 792 (6th

Cir. 2015) (targeting government infrastructure "is at least some evidence of intent to affect government conduct."); *United States v. McDavid*, 396 Fed. Appx. 365, 372 (9th Cir. 2010) ("the group had discussed a number of different ways to disrupt the government and economy, that the object of the conspiracy was federal facilities, and that [the defendant] had clearly expressed his goals and objectives in disrupting the government.").

The link between the church target and a specific intent to influence or affect government conduct is far more attenuated. Mr. Alowemer and the undercover agents limited their discussions of attacks to religious sites (the group first discussed attacking a mosque before moving onto the church target). Appx 142.

That Mr. Alowemer lacked a goal or outcome as it relates to government conduct is also seen in the district court's finding that Mr. Alowemer's offense was calculated to influence or affect the conduct of a whole host of governments "including the United States, the city of Pittsburgh, the Pittsburgh police, and Nigeria." There were conceivable ancillary knock-on effects to one or more of these governments from the plot to destroy the Legacy International Worship Center church,

Indeed, broadly speaking, any support for a terrorist organization will have down-the-line effects on any number of government and non-governmental organizations. But there was no specific calculation from Mr. Alowemer that this plot would directly influence or affect the conduct of the governments found by the district court in any particular way. In other words, the district court's finding that Mr. Alowemer specifically intended to influence the conduct of *all* of these governments undercuts its holding regarding Mr. Alowemer's specific intent as to any one of them. Mr. Alowemer expressed animosity towards a variety of institutions and governments. But this expressed animosity cannot form the basis for finding the offense itself was specifically calculated to impact government conduct.

In finding the terrorism enhancement applied, the district court compared Mr. Alowemer's case to *United States v. Stein*. Appx 665. In that case, the defendants planned to detonate explosives at apartment buildings where Muslims lived and to target landlords who rented to Muslims and local government officials that the defendants blamed for bringing Muslims to the area. Significantly, the defendants also planned to – contemporaneously with the attack – release a manifesto

addressed "to the U.S. govt and the American people" to change its border policy and stop allowing Muslims into the country.

The Tenth Circuit found that while the primary purpose was to target a civilian population, the offenses were *also* calculated to influence government immigration conduct. This is because the contemporaneous "manifesto" was addressed to the U.S. government and emphasized "it must be understood by all what our government is up to . . ." and defendants revealed "multiple references to the immigration policy of the Obama administration as motivating factor for the attack." *Stein*, 985 F.3d at 1267.

Mr. Alowemer's actions here are distinguishable. There was no "manifesto." No communications were directed towards the United States government, nor were any discussed. No policy changes were urged by Mr. Alowemer. There was no desire for the United States government to act in any particular way. Beyond general anti-American frustrations, and as opposed to the defendants in *Stein*, there is no clear secondary purpose to influence or affect United States government actions in any particular way through this attack.

In fact, as opposed to the *Stein* defendants, Mr. Alowemer steered clear from taking political credit for the attack. As noted by ISIS government expert Dr. Clarke, claiming credit for attacks perpetuated in their name is a key approach that ISIS uses to further their strategic goals. Appx 646. Crucially, Mr. Alowemer stopped short of this tactic. Mr. Alowemer explicitly withdrew his support for leaving an ISIS flag or mark or claiming any credit. He told the agents "we don't have to say that we're ISIS. We'll stay quiet." Appx 595.[10]

To be sure, Mr. Alowemer sent troubling ISIS propaganda videos and communiques to the undercover agents. Strong anti-United States themes infused their conversations. One video even depicted the White House burning with an ISIS flag being raised.

But the guidelines language focuses on "what the activity was calculated to accomplish, not what the defendants' claimed motivation behind it was." *United States v. Jayyousi*, 657 F.3d 1085, 1115 (11th Cir. 2011). There were multiple conversations that contained anti-

---

[10] While Mr. Alowemer at the fourth meeting toyed with the idea that they leave an ISIS flag with the words "we arrived" near the scene of the attack, at this same meeting he cdisavowed any actions or communications to take credit for the attack. Appx 595.

American sentiments. But the gravamen of Mr. Alowemer's offense is his selection of the Legacy International Worship Center as a target and his planning of an attack on the church. That is the basis of his conviction, *i.e.*, that he attempted to provide material support to a foreign terrorist organization, and that material support was his "services and personnel." Appx 126. The evidence shows that Mr. Alowemer chose the church as a target for religious reasons rather than any specific attempt to influence United States government conduct.

### A.    The calculated purpose of the plot was to attack a "polytheist" Christian church for religious reasons.

Mr. Alowemer was generally frustrated at the treatment of Muslims worldwide. For misguided reasons, in part due to his retriggered PTSD, *see* Section III below, he saw support for ISIS as the best expression of that support. He pled guilty to material support for ISIS. § 2339(b). But general expressions of disagreement with the United States made via a selection of private text messages cannot form the basis to trigger the terrorism enhancement. The central inquiry is what the offense was calculated to achieve While Mr. Alowemer expressed anti-American attitudes, the selection of the Christian

"polytheist" church in Pittsburgh is the culmination of his religious frustrations.

Repeatedly in conversation with the undercover agents, Mr. Alowemer focused on religious grievance. The messaging between Mr. Alowemer and the undercover agents centered on what it means to be a good Muslim. Appx 309. Mr. Alowemer's acapella "nasheed" chant did not reference any government, but rather, focused on "defeating the Shi'ites." Appx 561, Appx 977, Appx 253. Early on in their conversations, Mr. Alowemer and the UCE considered attacking a mosque because "apostates" (Shi'a Muslims) frequented the mosque. Appx 492-493. Mr. Alowemer vetoed placing explosives at this mosque because there was a risk of harming Sunnis, who he saw as true Muslims. Appx 76. Later, when the conversation turns to attacking a church, there are multiple derogatory references to "polytheist Christians." Appx 80, Appx 239-241, Appx 446.

Mr. Alowemer's disparaging comments about the overt religiosity of Nigerian Sufis – which predated any contact with the FBI – clearly shows how religious animus drove his actions. The Facebook comments about Sufis are the *one and only* instance where Mr. Alowemer makes a

public comment on a social media platform on a pro-ISIS post. Appx

1025. Mr. Alowemer is viscerally angry at the religious demonstration

of Nigerian Sufis. There is no mention of government or government

action.

The district court similarly found that Mr. Alowemer's religious

animus guided his offense conduct. According to the district court Mr.

Alowemer "wanted to instill fear in religious practitioners and prevent

them from going to their places of worship." Appx 669. The court also

found that Mr. Alowemer's intention was framed in religious terms:

"the operation must be done in the early hours of Sunday to shock the

enemies of Allah everywhere and all over America." *Id.*

### 1. The district court improperly conflated Mr. Alowemer's calculation with the goals of ISIS as an organization.

Despite these findings, in other parts of its ruling the court

erroneously conflated the goals of ISIS as an organization with the

specifics of Mr. Alowemer's understanding, conduct, and motivation.

When detailing its reasons for applying the enhancement, the

district court found Mr. Alowemer "was motivated to support the cause

of ISIS," wanted to "inspire other brothers to join together and take

similar action," and "pledged support to the leader of ISIS, Al-Baghdadi." Appx 667; 669-670 The government noted throughout the sentencing hearing that ISIS and al-Baghdadi "do not believe in man-made government" and according to ISIS "you can't separate politics and governance from religion." Appx 561. From this, the government argued at sentencing – primarily based on the testimony of Dr. Clarke – that because Mr. Alowemer supported ISIS, he must also share ISIS leadership understanding about politics and governance. In other words, because ISIS doesn't view religion and government as separate, Mr. Alowemer also doesn't separate the two. Therefore, as that argument goes, Mr. Alowemer's religious motivations are, in fact, political ones.

But this argument misunderstands the "specific intent" requirement of § 2332b(g)(5)(A). *See, e.g.*, *Alhaggagi*, 978 F.3d at 701. While Mr. Alowemer pled guilty to supporting ISIS, if the views of ISIS leadership were imputed to any defendant whose conduct furthered or bolstered ISIS who supported them, then the § 3A1.4 enhancement would apply in every material support case. Every foreign terrorist organization seeks to influence government conduct (or to retaliate)

against governments and every instance of material support furthers

those terrorist organizations. *See Holder v. Humanitarian Law Project*,

561 U.S. 1 (2010). But that is not the inquiry. The inquiry is what Mr.

Alowemer calculated as his "object" for plotting to plant explosives at

the North Pittsburgh church – he wanted to strike at a religious site for

religious reasons. The district court's findings here improperly

substituted the beliefs and goals of ISIS leadership with what Mr.

Alowemer specifically calculated his offense to accomplish. ISIS

members are not monolithic. Appx 647. As detailed in this brief, Mr.

Alowemer saw the world through a religious lens with an

unsophisticated understanding of world politics and governance. While

he consumed ISIS propaganda, his animus was religiously based, rather

than political.

### B.    The plot was not calculated to influence or affect the city of Pittsburgh nor the Pittsburgh police.

The district court also erred in finding that Mr. Alowemer's

actions were calculated to influence or affect the conduct of the city of

Pittsburgh or the Pittsburgh police department.

During the fourth meeting with the undercover agents, Mr.

Alowemer raised the possibility of planting a second explosive device

that would be triggered when first responders investigated the initial explosion. In this context, Mr. Alowemer made a single comment that mentioned the city of Pittsburgh. Mr. Alowemer said to the UCE that this potential second explosive would harm police responders and could "lock down the whole – whole Pittsburgh," PSR ¶ 24. But crucially, moments after making this statement, Mr. Alowemer then disavows that there should be a second bomb. He then reiterates in the following meeting that there should be no second device. Appx 593.

The district court erred when it found the mere mention of the abandoned second explosive was "germane to the overall intent in this case." Appx 668. The district court credits the suggestion of the second bomb but then essentially ignores that he then disavowed that plan. As is the case with Mr. Alowemer's discussion of leaving an ISIS banner at the church, but then retracting his support for this tactic, Mr. Alowemer's disavowal of a second bomb goes to what purpose Mr. Alowemer "calculated" his conduct to accomplish.[11] He explicitly did not

---

[11] As noted by the government at the sentencing hearing, Mr. Alowemer made numerous confusing and contradictory statements to the undercover agents during this investigation. As noted by the government attorney "it's simply impossible to know which statement

wish to include a second bomb as part of the plot; what he calculated should reflect that second bomb disavowal. The district court erred by including mere mention of a second bomb as part of the "object" of the offense conduct in this case.

And while this stray comment indicates Mr. Alowemer believed the explosions would cause gridlock in Pittsburgh, there remains the question of what conduct by the Pittsburgh city government was Mr. Alowemer specifically intending to influence or affect? Courts have found that local municipalities are included in the meaning of "government" in § 2332b(g)(5). But in these cases, the terrorism enhancement was applied to offenses which target municipal buildings where there is a clear connection between the offense and what conduct the defendant aimed to influence or affect. *See United States v. Harris*, 434 F.3d 767, 773 (5th Cir. 2005) (applying the terrorism enhancement to the destruction of a municipal building housing the local police station because the defendant wanted to destroy evidence related to a criminal proceeding).

---

at which particular point in time [Mr. Alowemer] wants to adhere to." Appx 822-823.

The enhancement does not apply to a defendant whose purpose was to cause fear amongst a population or gridlock in a particular area. Counsel was unable to locate a case where the terrorism enhancement applied where the "government conduct" a defendant was found to have specifically calculated to influence or affect is gridlock. The Eleventh Circuit upheld the application of the terrorism enhancement in *United States v. Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004) where the defendants' objective - when planning to bomb electrical substations and cause civil strife in Miami – was to demand the release of Muslim prisoners and other distinct changes in United States government policy. *Id*. at 1248. By contrast, Mr. Alowemer never makes or infers a connection between the city of Pittsburgh (or the Pittsburgh police) and ISIS. He never hints at or articulates any conduct by the city of Pittsburgh he wishes to affect, other than spreading fear amongst people in the city of Pittsburgh and causing a "lock down."

As for the police, the same reasons apply as to why the plot was not specifically calculated to influence or affect the city of Pittsburgh. In addition to this, the Pittsburgh police is not a government entity

contemplated by the enhancement.[12] Counsel has been unable to locate a case in which the terrorism enhancement was applied where the governmental entity at issue is a municipal police department. While Mr. Alowemer acknowledged in conversation with the undercover agents that police would respond to explosive devices, there is nothing to suggest that Mr. Alowemer calculated the explosions would influence or affect the police in any particular way beyond responding to the situation. Indeed, if merely showing an awareness of police response was enough to trigger the terrorism enhancement, then every material support for terrorism offense would trigger the enhancement simply because of the eventual law enforcement response.

### C.    Mr. Alowemer plotted to attack a church to intimidate a Christian civilian population, not to influence government conduct.

Mr. Alowemer's comment about causing a "lock down" of Pittsburgh lends further support to the fact that he calculated his offense to "intimidate or coerce a civilian population." U.S.S.G. § 3A1.4,

---

[12] The government never took the position – in pre-sentencing filings or at the sentencing hearing itself – that the Pittsburgh police was a governmental entity to be influenced or affected for purposes of this enhancement.

cmt. 4. Repeatedly in conversation with the UCE, Mr. Alowemer referred to attacking the "polytheists and infidels." Appx 970. As noted above in Section IA, the district court found Mr. Alowemer hoped to instill fear in religious practitioners" and wanted to conduct the operation on Sunday morning "to shock the enemies of Allah everywhere and all over America." Appx 669. Admittedly, Mr. Alowemer wanted Christians waking up for Sunday services to be fearful because of his attack. But from his own words (and the district court's own findings), the plot was clearly aimed at citizenry – Christian churchgoing citizens – rather than objectively government conduct.

With Application Note 4, the Sentencing Commission contemplated Mr. Alowemer's exact situation. The Commission realized that a defendant who targeted a civilian population – in Mr. Alowemer's case, for religious reasons – would be ineligible for the terrorism enhancement under the statutory language. The guidelines provide for an alternative: an upward departure where the defendant's "motive was to intimidate or coerce a civilian population, rather than influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct." U.S.S.G. § 3A1.4, cmt. 4. By

crafting the Guideline in this way, the Commission wanted to be sure that courts have the discretion to impose an upward departure. This makes sense, § 3A1.4, particularly via Application Note 4, disaggregates crimes involving a motive to affect government conduct from crimes involving a non-governmental motive.

The Sentencing Commission articulated its rationale for including the upward provision. *See* U.S.S.G. Amendment 637. The upward departure was included because of the "expected infrequency of these terrorism offenses." U.S.S.G. Amendment 637, App. C. From this it can be inferred that the terrorism enhancement is to be used only in cases where government conduct is clearly targeted. That was the expectation of the Sentencing Commission. The enhancement is not to apply automatically in every case where government conduct is only influenced, affected, or retaliated against in a merely conceivable or ancillary way. Here, Mr. Alowemer does not contest that he would be eligible for an upward departure from the non-terrorism guidelines in this case. But his words and actions in this case show he plotted to plant explosives at a church to intimidate "polytheist" Christian civilians. His actions did not target objectively government conduct.

### D.    The plot to attack a Christian church in the United States was not calculated to influence or affect the Nigerian government.

As for the government of Nigeria, Mr. Alowemer did not specifically calculate that his plot to attack a Christian church in America would influence or affect the government of Nigeria. To this point, the district court made few factual findings. If a court decides to impose such a dramatic enhancement, it "should identify the evidence in the record that supports its determination." *United States v. Chandia*, 514 F.3d 365, 376 (4th Cir. 2008) (remanding for factual findings on whether the defendant possessed the intent required for application of the terrorism enhancement). Beyond Mr. Alowemer mentioning the Legacy International Worship Center is a church attended by Nigerians, there are few facts that support the conclusion that Mr. Alowemer calculated his offense to influence or affect the Nigerian government.

It is unclear how an attack on a Christian church in America would have influenced or affected the government of Nigeria in any particular way (nothing about the church is objectively Nigerian government conduct). Mr. Alowemer chose a time – the middle of the

night – that would have minimized casualties and then insisted they "stay quiet" about the attack. Appx 595. There were no communications from Mr. Alowemer that he was motivated to impact the Nigerian government or alter Nigerian government policy.

At the sentencing hearing, the government offered an exhibit that was a screenshot from Mr. Alowemer's phone of an ISIS news release about its activities in Africa. While the news release references ISIS activities in Africa, it does not reference a specific government. Appx 563-564; Appx 982-983. While Mr. Alowemer had a general awareness that ISIS is fighting for territory in Africa, and that Nigeria is a country in Africa, this is insufficient basis for the terrorism enhancement to apply. As noted above, Mr. Alowemers' clearest comments about Nigeria and Nigerians during the investigation of this case was when he expressed anger about the overt religious demonstrations of Sufis in Nigeria.

## III. The offense was not calculated to retaliate against the conduct of any government.

Mr. Alowemer did not subjectively calculate his offense to retaliate against the conduct of either the Nigerian or the United States governments for their military actions against ISIS. Appx 670.

"Cases applying the retaliation prong rely on evidence that the defendant intended to respond to specific government action." *United States v. Alhaggagi*, 978 F.3d at 703. For instance, in *United States v. Van Haften*, the defendant traveled to Turkey "to join ISIS's war against America" because he wanted to retaliate against the United States government's treatment of Muslims and *specifically* for the United States government's treatment of him as a sex offender. 881 F.3d 543, 544 (7th Cir. 2018) (emphasis added). In *United States v. Dye*, the Sixth Circuit upheld the application of the terrorism enhancement, concluding that firebombing a specific bailiff's office showed the defendant's intent to retaliate against the federal institution for its ongoing criminal case against him. 538 Fed. Appx. 654, 666 (6th Cir. 2013). In *United States v. Salim*, the Second Circuit affirmed application of the enhancement based on a finding that the defendant's

offense was in retaliation for a district court's denial of a substitution of counsel request. 549 F.3d 67 (2d Cir. 2008).

In cases where courts apply the terrorism enhancement under the "retaliation" prong, such as those referenced in the above paragraph, it is clear: (1) which government the offense was calculated to retaliate against, and; (2) what the government did to cause the defendant to seek retaliation. By contrast, on both scores, the evidence in Mr. Alowemer's case is far murkier. Beyond general frustration with the treatment of Muslims and his general support for ISIS, Mr. Alowemer's plot against a church on the North Side of Pittsburgh was not retaliation for any specific government conduct of either Nigeria nor the United States.

Before the district court, the basis for arguing that Mr. Alowemer "calculated" his attack to retaliate against Nigerian government conduct rested on a single exchange where the UCE asked Mr. Alowemer why he was plotting against the Legacy International Worship Center church. Appx 971. Mr. Alowemer's first response is that "they are all polytheists." Only after stammering, does he offer the "revenge for the brothers in Nigeria" rationale. The undercover agent

pushed as to whether Mr. Alowemer's reference to "brothers in Nigeria" is to Boko Haram. To this, Mr. Alowemer admitted he isn't sure about the situation between the competing factions in Africa and that he doesn't know whether Boko Haram "pledged fealty to ISIS."

Mr. Alowemer quickly sidesteps this uncertainty by stating that what ultimately matters is "they all were pious." His emphasis on the piety of the groups and that the churchgoers are "polytheists" rather than the precise affiliation of Boko Haram to ISIS shows his plotting offense was calculated to affect churchgoing Christian civilians rather than retaliate against specific government conduct.

Disaggregating the Islamic fundamentalist factions in Africa was extremely complex, not only to 20-year old refugees reading news via their phone social media feeds, such as Mr. Alowemer, but also to expert analysts like Dr. Clarke.[13] Appx 637. In fact, at times in 2018-2019, Boko Haram and ISIS were both claiming to be ISIS. Appx 638-639. These Islamic fundamentalist groups were also battling a "coalition of nations" including Nigeria and the United States. Appx 622. As noted

---

[13] Dr. Clarke testified that ISIS and Boko Haram fought each other for territory and adherents, and it was difficult to sort out the precise boundaries and loyalties of these groups.

by Dr. Clarke, these fault lines were drawn on religion lines – Islamic fundamentalist versus Christendom. Appx 624.

The confusion over the political situation in Africa is revealed in Mr. Alowemer's responses to the undercover agent. Mr. Alowemer doesn't know who, precisely, the Nigerian government or military is fighting. When questioned about whether he wants to support Boko Haram "brothers," he's not sure. All that matters to Mr. Alowemer is that they are targeting polytheist Christians at a church. Mr. Alowemer's plot against the church shows his support for Islamic fundamentalists in Africa (and elsewhere). But it falls short of retaliation against specific government conduct. Ultimately, this single mention of the word "revenge" regarding Nigeria within thousands of pages of transcripts is not enough to trigger such a strong enhancement – particularly when read in context. The religiosity is what animates the supposed revenge rather than any government conduct.

Furthermore, there has never been any attempt – by the government or the district court – to identify particular Nigerian government conduct against which Mr. Alowemer was supposedly retaliating. There are broad references to Nigerian military actions, but

no specific government conduct. At sentencing, the government offered

into evidence screenshots from Mr. Alowemer's phone of news articles.

According to Agent Edquist these screenshots "depict[ed] what was

going on specifically in Nigeria." Appx 507-508; Appx 1003-1009. From

this, the government argued that Mr. Alowemer was retaliating against

these particular Nigerian military actions about which he was reading

in the news or on social media.

This argument is deeply flawed. First, other countries in Africa –

other than Nigeria – are mentioned in the news articles, including the

governments of Niger and Mali. Second, the screenshotted news articles

depict battles or military actions that occurred in these various

countries on June 8, 9, and 15, 2019. Appx 1003-1006. Mr. Alowemer

made his "revenge for the brothers in Nigeria" *before* these dates at the

meeting on June 2, 2019. Appx 971. Under the government's muddled

argument, Mr. Alowemer wanted to take revenge against conduct that

hadn't yet occurred.[14]

---

[14] If there was conduct by the Nigerian government prior to June 2, 2019 for which Mr. Alowemer was taking revenge, the government was free to offer evidence from Mr. Alowemer's phone, which had been in their possession since his arrest.

Mr. Alowemer pled guilty to supporting ISIS. He supported ISIS efforts in Africa in 2019. On his phone he searched for news articles about ISIS in Africa in 2019. That Nigeria is one of the governments against which ISIS is fighting in Africa is insufficient for application of the terrorism enhancement under the retaliation against government conduct prong.

As for supposed retaliation against the government conduct of the United States, Mr. Alowemer makes two references to supposed "revenge" or "retaliation" in conversation with the undercover agents.

Prior to meeting with the agents in-person, Mr. Alowemer offered to the UCE that he could get information for the brothers about Kurdish Yazidis living locally in order to target them. Appx 487.

In his first in-person meeting with the agents, Mr. Alowemer told the UCE that he saw a United States military person in a wooded area and said he would hunt and kill him to retaliate against United States military actions in Baghuz.[15]

---

[15] Al-Baghuz, Syria is the site of a major battle where Kurdish forces, with assistance from the United States, defeated ISIS. Appx 628-629.

58

Neither of these comments are sufficient to find the terrorism enhancement applies in this case.

First, when discussing Yazidis Mr. Alowemer again frames his worldview through a religious lens. Mr. Alowemer's first reference is to the "atheist Yazidis." As found by the district court, according to Mr. Alowemer, the Yazidis are the "enemies of Allah." Appx 667. While the district court found that Mr. Alowemer's offer to provide the undercover agents Yazidi targets is evidence of his retaliatory intent, there is no government conduct that Mr. Alowemer seeks to retaliate against. The Kurds are a religious and ethnic minority in Syria, Iraq, and Turkey, not a government. And as noted by Agent Edquist at the sentencing hearing, Mr. Alowemer never links his hostility towards Yazidis to the United States or United States military action. Appx 560. The focus on Yazidis is yet more evidence that he is motivated by religious intolerance against "apostates" (aka nonbeliever) civilians. Appx 640; *See* Section IA, above.

Second, Mr. Alowemer's comments to the undercover agents are boastful, vain attempts to impress men – whom he sees as older brothers – whom he has just met. There is no substance or clear intent

behind the comments because Mr. Alowemer also fully admits to the agents that he doesn't know anything about committing violence. At the first meeting, the UCE emphasized that if anyone was not serious "then that Moslem needs to leave" and without violent action "there is no point for anyone to be at this table." Appx 309. The UCE offered himself as an explosives expert and emphasized that "talk means nothing." Appx 582.

Mr. Alowemer reflected this big talk by the undercover agents by voicing his fantasy about hunting and killing the United States serviceman in the woods. Mr. Alowemer also brags to the undercover agents that he once blew up a minaret because it had an "unbeliever" Christian in it. Appx148. [16] But these are nothing but fantasies articulated with the hope of impressing an authority figure.

And shortly after these empty boasts, Mr. Alowemer admitted his inexperience in acts of violence. Mr. Alowemer said that he had never used a weapon before. Appx 604-605. Later at this meeting, Mr.

---

[16] There is no evidence that Mustafa's claim about destroying a Minaret is anything but a tall tale.

60

Alowemer stated "I will do anything you tell me currently because, truthfully, I don't know anything." Appx 605.

Mr. Alowemer's hollow bragging fits with an overall theme of him shading the truth (or outright lying) to the undercover agents. Early on, he told the OCE that the police had "raided" his home and seized his devices, but Agent Edquist confirmed there was no police raid of the Alowemer home. Appx 543, 545. As noted by the government at the sentencing hearing, Mr. Alowemer often had a tenuous grasp of the truth during his interactions with the undercover agents: "it's simply impossible to know which statement at which particular point in time [Mr. Alowemer] wants to adhere to." Appx 822-823.

In the end, these crowing comments have nothing to do with the offense conduct at issue here. Again, the central question is whether Mustafa's *actions* in this case were "calculated, *i.e.*, planned – for whatever reason or motive – to achieve the stated object" of interfering or retaliating against government conduct. *Awan*, 607 F.3d at 317 (emphasis added). Mr. Alowemer's. Yazidis and No Yazidis were targeted. No soldiers were hunted. No steps were taken towards either. It is juvenile, fatuous bragging, with nothing to back it up. Mr.

Alowemer's brash talk during these secretly recorded conversations cannot be the basis for finding that he calculated his plotting to plant explosives at a church in North Pittsburgh to retaliate against (or influence/affect) government conduct.

## IV. The district court failed to consider evidence that Mr. Alowemer's PTSD made him vulnerable to suggestion and compliance with the undercover agents and more likely to defer to their authority.

The district court entirely failed to evaluate Mr. Alowemer's statements to the undercover agents – whom he saw as authority figures – with the proper psychological context. Dr. Guarnera opined that Mr. Alowemer had the most severe trauma history of anyone she had ever evaluated. Appx 756-757. Dr. Steven Weine opined that ISIS' online communities strategically invited psychologically vulnerable Mr. Alowemer to make choices he would have otherwise been unlikely to make. Appx 357.

But when it found the terrorism enhancement applied the district court made no mention of Dr. Guarnera's findings or Dr. Weine's perspectives on the pull of ISIS' online communities. When measuring what Mr. Alowemer subjectively calculated with his offense conduct, it was error for the district court to consider his statements at face value

but refuse to consider how Mr. Alowemer's pervasive PTSD influenced those statements.

According to Dr. Guarnera, adolescents with severe PTSD are especially vulnerable to defer to and comply with authority figures. On multiple occasions, Mr. Alowemer referred to himself as the younger brother to the OCE. Mr. Alowemer stated he "is going to follow [UCE] advice because [UCE] is older than [Mr. Alowemer] and he considers [UCE] as his older brother." Appx 940.

This suggestibility, compliance, and deference to authority resulted in Mr. Alowemer's vulnerability to external suggestion, acquiescence to what he saw as requests or demands, and looking to authority figures for direction. Because of his PTSD Mr. Alowemer was "already prone to compliance" and was "particularly vulnerable to compliance with those [he] consider[ed] to be in authority." Appx 939. This is reflected throughout the thousands of pages of recorded conversation and online messaging with the undercover agents. Mr. Alowemer was "more motivated by the short-term reward of pleasing an authority figure (or avoiding the disapproval) he was of the long-term negative consequences of complying with the demand." App 939.

63

While there were times that Mr. Alowemer took the initiative in proposing ideas, there were other times where Mr. Alowemer seemed to be overcome by suggestibility or compliance with the wishes of the undercover agents. Mr. Alowemer expressed hesitancy about an action only for the agents to provide reasons to overcome that hesitancy. For instance, Mr. Alowemer initially told the undercover agents that he only wished to "work with them in the fields of information dissemination and electronics." Only after the UCE directly stated that if a person is unwilling to go beyond information gathering alone "then that Moslem needs to leave" and "there is no point for anyone to be at this table" without violent action did the conversations switch to "cooking" (making explosives" for the first time. Appx 308-309.

As another example, Mr. Alowemer posted numerous religious texts with the message that a Muslim should prioritize obedience to his parents over jihad (his parents would not want him to engage in violent jihad, so he must obey them.). In response, the UCE posted a verse that instructs the believers not to support their parents if the parents decide

to become disbelievers and then wonders whether refusing Jihad as a

duty is considered a disbelief. Appx 937.[17]

The culmination of Mr. Alowemer's trauma-influenced response to

the UCE are times when he mirrored the UCE's words of urgency. He

inflated his own willingness and ability to use a weapon. But he had no

realistic intent, knowledge, or ability – as detailed in the previous

section – to obtain a gun to hunt a soldier in a forest. He had never even

---

[17] As noted by Dr. Guarerna, there is also evidence that Mr. Alowemer
wrestled with how to comply with the preferences of the undercover
agents while steering the planning of the offense away from harming
people. A number of examples stand out from the transcripts of Mr.
Alowemer's interactions with the undercover agents.

During the third meeting, UCE asked Mr. Alowemer if he wanted
to harm the "polytheist Christians" in the church or if he just wanted
to burn the building. Appx 585. Mustafa deferred answering, telling the
UCE that he does not know and he will need more time to think about
the answer. Appx 585. When the UCE circled back to whether Mr.
Alowemer wants the explosive to destroy the church or to kill people,
Mr. Alowemer again deflects away from killing – saying that he doesn't
"think there's going to be people in [the church]." Appx586-587.

Similarly, when plotting the attack, Mr. Alowemer asks when
prayer services are set at the church. The UCE told Mr. Alowemer that
common worship time is at 11:00 a.m. on Sunday morning. Appx 515.
To this, Mr. Alowemer said that the explosives should be set early in
the morning, around 3:00 a.m. Appx 584.

Finally, when discussing a "second" explosive that would have
caused harm to those responding to the first, Mr. Alowemer proposes
the idea of a second explosive, but then, within the same meeting,
disavows a second explosive. Mr. Alowemer says "we want to destroy
and burn, I think that just one bag is enough." Appx 593.

used a weapon. He believed it would comply with and defer to the wishes of the older men he had just met.

This is not to suggest that Mr. Alowemer was not guilty. He pled to supporting ISIS in violation of 18 U.S.C. § 2339B. He accepted responsibility for his crimes. He asked for sentencing mercy from the district court.

But he was also a frustrated young man with severe PTSD from an adolescence spent in a war zone. News regarding the death of friends and loved ones in Syria left him with a deep sense of hopelessness and survivor's guilt. His words were the ventings of a young man with complex and pervasive PTSD. He was attempting to comply with what he thought authority figures wanted to hear from him. Dr. Guarnera's psychological evaluation explained, in part, his empty bragging comments to the undercover agents. Given his trauma history and age at the time of the offense, Dr. Guarnera concluded that Mr. Alowemer was "neurodevelopmentally primed to comply with individuals he viewed as authority figures." Appx 940.

Mr. Alowemer's words were used as evidence of what he subjectively calculated in this case. The district court cited statements

to the undercover agents where he expressed animus towards the United States, wished to kill an American soldier, and hoped to die as a suicide bomber, among others. But Mr. Alowemer's words were evaluated unmoored from the psychological context in which they were said. The words were credited at face value – as if they existed free of any psychological influence or situation. The court ignored a detailed expert report on how his psychological infirmities led to this kind of outrageously boastful talk in the first place. This was clearly erroneous.

## CONCLUSION

For the forgoing reasons, Mr. Alowemer respectfully asks this Court to find that the district erred when it imposed the terrorism enhancement to his case. Accordingly, Mr. Alowemer asks for a remand and resentencing.

Respectfully submitted,

*/s/ Sam Saylor*
Sam Saylor
Assistant Federal Public Defender
PA I.D. No. 315442

Counsel for Appellant
Mustafa Alowemer

## CERTIFICATE OF MEMBERSHIP IN BAR

I, Sam Saylor, Assistant Federal Public Defender, certify that I am not a member of this Court's Bar, but an attorney with the Office of the Federal Public Defender.

*/s/ Sam Saylor*
Sam Saylor
Assistant Federal Public Defender

## CERTIFICATE PURSUANT TO FEDERAL RULE OF APPELLATE PROCEDURE 32(a)(7)(C)

I, Sam Saylor, hereby certify that the within Brief for Appellant contains 12,342 words, exclusive of title page, Table of Contents, Table of Authorities and certificates of counsel.

*/s/ Sam Saylor*
Sam Saylor
Assistant Federal Public Defender

## CERTIFICATE OF IDENTICAL TEXT

I, Sam Saylor, hereby certify that the text of the E-Brief and Hard Copies of the Brief for Appellant filed on behalf of Mustafa Mousab Alowemer filed at No. 22-3217 are identical.

*/s/ Sam Saylor*
Sam Saylor
Assistant Federal Public Defender

# CERTIFICATE OF VIRUS CHECK

I, Sam Saylor, hereby certify that a virus check was performed on the Brief for Appellant filed on behalf of Mustafa Mousab Alowemer filed at No. 22-3217 using Symantec Endpoint Protection v14.2.3332.1000 software.

***/s/ Sam Saylor***
Sam Saylor
Assistant Federal Public Defender

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

No. 22-3217

---

UNITED STATES OF AMERICA
Appellee,

V.

MUSTAFA MOUSAB ALOWEMER
Appellant.

---

**APPENDIX FOR APPELLANT**
**VOLUME I of III (pp. 1-10)**

---

Suite 1500
1001 Liberty Avenue
Pittsburgh, PA 15222
(412) 644-6565

LISA B. FREELAND
Federal Public Defender

SAM SAYLOR
Assistant Federal Public Defender

Attorneys for Appellant,
Mustafa Mousab Alowemer

# <u>CONTENTS OF APPENDIX</u>

**Appeal No.  22-3217**
**District Court No. 2:19-cr-00219**

**Volume I:  (Attached to Brief for Appellant)**

Judgment in Criminal Case (Doc. 151) .................................................1-9

Notice of Appeal (Doc. 153). ....................................................... 10

**Volume II:**
USA v. Mustafa Mousab Alowemer
Criminal No. 2:19-cr-00219

Docket Entries ....................................................................11-29

Complaint and Affidavit (Doc. 3) .......................................................30-56

Preliminary Examination Transcripts ........................................... 57-125

Indictment (Doc. 18) .......................................................126-129

Indictment Memorandum (Doc. 19).............................................130-133

Detention Hearing Transcripts (Doc. ) .........................................134-191

Change of Plea (Doc. 112) ..................................................... 192

Change of Plea Hearing Transcripts ........................................... 193-232

Government's Position with Respect to Sentencing Factors
    (Doc. 126) .................................................................. 233-234

Mr. Alowemer's Position with Respect to Sentencing Factors
    (Doc. 127) .................................................................. 235-249

Objections to Mr. Alowemer's Position with Respect to Sentencing
     Factors (Doc. 132) ................................................................250-266

Mr. Alowemer's Sentencing Memorandum (Doc. 136)................. 267-431

Government's Sentencing Memorandum (Doc. 137) ....................432-444

Mr. Alowemer's Response to Government's Objections to Position with
     Respect to Sentencing Factors (Doc. 143) ............................445-456

Tentative Rulings and Filings (Doc. 144) .....................................457-467

Government's Response to Mr. Alowemer's Sentencing Memorandum
     (Doc. 145) ..............................................................................468-472

Sentencing Hearing Transcripts, November 4, 2022 (Doc. 155) ..473-676

Sentencing Hearing Transcripts, November 8, 2022 (Doc. 156) ..677-896

**Volume III:**
**SEALED**
USA v. Mustafa Mousab Alowemer
Criminal No. 2:19-cr-00219

Exhibit A from Sentencing Memorandum....................................897-956

Government's Exhibits from November 4, 2022
     Sentencing Hearing ...........................................................957-1013

Defense Exhibit 1 from November 4, 2022
     Sentencing Hearing...........................................................1014-1036

Plea Agreement ...................................................................... 1037-1042

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT
## Western District of Pennsylvania

| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
|---|---|---|
| v. | ) | |
| MUSTAFA MOUSAB ALOWEMER | ) | Case Number:  2:19-cr-00219-MJH-1 |
| | ) | USM Number:  39533-068 |
| | ) | Andrew Lipson |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s) ____ONE_____

☐ pleaded nolo contendere to count(s) _____
  which was accepted by the court.

☐ was found guilty on count(s) _____
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18:2339B(a)(1) | Attempting to provide material support and resources, to with service and personnel, to a designated foreign terrorist organization (ISIS) | 6/19/2019 | 1 |

The defendant is sentenced as provided in pages 2 through ____9____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s) ____2 and 3_____ ☐ is ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

____11/10/2022____
Date of Imposition of Judgment

_Marilyn J. Horan_ (signature)
Signature of Judge

Marilyn J. Horan, United States District Judge
Name and Title of Judge

____11/10/2022____
Date

**Appx1**

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

| | | | | | |
|---|---|---|---|---|---|
| | Judgment | Page | 2 | of | 9 |

DEFENDANT:   MUSTAFA MOUSAB ALOWEMER
CASE NUMBER:   2:19-cr-00219-MJH-1

## IMPRISONMENT

       The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
208  months.

☑ The court makes the following recommendations to the Bureau of Prisons:
   1. The defendant be placed in a facility close to Pittsburgh, Pennsylvania.
   2. The defendant be permitted to receive vocational training.
   3. The defendant receive behavioral health treatment.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐ at _____ ☐ a.m. ☐ p.m. on _____ .

   ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐ before 2 p.m. on _____ .

   ☐ as notified by the United States Marshal.

   ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

**Appx2**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3    Supervised Release

|  | Judgment Page | 3 | of | 9 |

DEFENDANT:    MUSTAFA MOUSAB ALOWEMER
CASE NUMBER:    2:19-cr-00219-MJH-1

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

LIFE.

## MANDATORY CONDITIONS

1.    You must not commit another federal, state or local crime.
2.    You must not unlawfully possess a controlled substance.
3.    You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.    ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.    ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.    ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.    ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

**Appx3**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
      Sheet 3A  Supervised Release

| | | | | | | |
|---|---|---|---|---|---|---|
| | | Judgment | Page | 4 | of | 9 |

DEFENDANT:  MUSTAFA MOUSAB ALOWEMER
CASE NUMBER:  2:19-cr-00219-MJH-1

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.  If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13.  You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.


Defendant's Signature     _____    Date _____

**Appx4**

AO 245B (Rev. 09/19)　Judgment in a Criminal Case
　　　　　　　　Sheet 3B　　Supervised Release

|  | Judgment Page | 5 | of | 9 |
|---|---|---|---|---|

DEFENDANT:　MUSTAFA MOUSAB ALOWEMER
CASE NUMBER:　2:19-cr-00219-MJH-1

## ADDITIONAL SUPERVISED RELEASE TERMS

1. The defendant shall not illegally possess a controlled substance.

2. The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.

3. The defendant shall report any change of address within 30 days to the United States Attorney's Office while any portion of the restitution remains outstanding.

4. The defendant shall provide the probation officer with access to any requested financial information.

5. The defendant is prohibited from incurring new credit charges or opening additional lines of credit without prior written approval of the probation officer.

6. The defendant is permitted to possess or use a computer and is allowed access to the Internet. The defendant shall consent to the installation of any hardware or software to monitor any computer, or other electronic communication or data storage devices used by the defendant to confirm compliance with this condition. The defendant shall pay the monitoring costs as directed by the probation or pretrial services officer. Furthermore, the defendant shall consent to periodic unannounced examinations by the probation or pretrial services officer of any computers, cell phones, or other electronic communication or data storage devices that the defendant has access to, to confirm compliance with this condition. Additionally, the defendant shall consent to the seizure and removal of hardware and data storage media for further analysis by the probation or pretrial services officer, based upon reasonable suspicion of a violation of the conditions imposed in this case, or based upon reasonable suspicion of unlawful conduct by the defendant. Failure to submit to the monitoring or search of computers and other electronic communication or data storage devices used by the defendant may be grounds for revocation.

7. If the defendant's employment requires the use of a computer, the defendant may use a computer in connection with the employment approved by the probation or pretrial services officer, provided the defendant notifies their employer of the nature of the conviction or charge. The probation or pretrial services officer shall confirm compliance with this notification requirement.

8. The defendant shall provide the U.S. Probation Office with accurate information about the defendant's entire computer system (hardware or software) and other electronic communication or data storage devices or media to include all passwords used and the name of the Internet Service Provider(s). The defendant also shall abide by the provisions of the Computer Restrictions and Monitoring Program approved by the Court.

9. The defendant shall submit his person, property, house, residence, vehicle, papers, business or place of employment, to a search, conducted by a United States Probation or Pretrial Services Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of supervision. Failure to submit to a search may be grounds for revocation. The defendant shall inform any other residents that the premises may be subject to searches pursuant to this condition.

10. The defendant shall participate in a mental health assessment and/or treatment program approved by the probation officer, until such time as the defendant is released from the program by the Court. The defendant shall be required to contribute to the costs of services in an amount determined by the Probation Office. These costs shall not exceed the actual cost of the service. The Probation Office is authorized to release the defendant's presentence report to the treatment provider if so requested.

Case 2:19-cr-00219-MJH    Document 51    Filed 11/18/21    Page 6 of 9

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
        Sheet 3C    Supervised Release

Judgment    Page    6    of    9

DEFENDANT:   MUSTAFA MOUSAB ALOWEMER
CASE NUMBER:  2:19-cr-00219-MJH-1

## ADDITIONAL STANDARD CONDITIONS OF SUPERVISION

11. The defendant shall participate in the United States Probation Office's Workforce Development Program as directed by the probation officer.

12. The defendant shall cooperate in the collection of DNA as directed by the probation officer, pursuant to 28 C.F.R. § 28.12, the DNA Fingerprint Act of 2005, and the Adam Walsh Child Protection and Safety Act of 2006.

13. The defendant shall be deported if, after notice and hearing pursuant to the Immigration and Naturalization Act, 8 U.S.C. § 1228(d)(5), the Attorney General demonstrates by clear and convincing evidence the alien is deportable. The defendant shall not re-enter the United States of America, unless authorized in advance by the Secretary of the Department of Homeland Security or the Attorney General of the United States.

14. The defendant shall forfeit to the United States the following properties which are also identified in the forfeiture allegation and the plea agreement: 1) an Apple iphone 5S cellular phone with IMEI 35882305112361; 2) a Samsung J7 cellular phone with IMEI 35860109141464; 3) an LG LM-X410 cellular phone with IMEI 355380099566223; 4) a Dell Inspiron 3670 computer, express service code: 2574745958; and 5) associated electronic storage media seized on June 19, 2019, during the search of the defendant's residence.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
        Sheet 5    Criminal Monetary Penalties

| | Judgment Page | 7 | of | 9 |

DEFENDANT: MUSTAFA MOUSAB ALOWEMER
CASE NUMBER: 2:19-cr-00219-MJH-1

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $ 100.00 | $ | $ | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| TOTALS | $            0.00 | $            0.00 | |

☐ Restitution amount ordered pursuant to plea agreement    $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the    ☐ fine    ☐ restitution.

    ☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**Appx7**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                Sheet 6    Schedule of Payments

Judgment — Page    8    of    9

DEFENDANT:   MUSTAFA MOUSAB ALOWEMER
CASE NUMBER:   2:19-cr-00219-MJH-1

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☐   Lump sum payment of $ _____ due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance with  ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

**B**  ☐   Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

**C**  ☐   Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☐   Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
    term of supervision; or

**E**  ☐   Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
    imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☑   Special instructions regarding the payment of criminal monetary penalties:
    The defendant shall pay to the United States a special assessment of $100, which shall be paid to the United
    States District Court Clerk forthwith.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

| Case Number Defendant and Co-Defendant Names *(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☑   The defendant shall forfeit the defendant's interest in the following property to the United States:
1) Apple iphone 5S cellular phone with IMEI 35882305112361; 2) a Samsung J7 cellular phone with IMEI 35860109141464; 3) an LG LM-X410 cellular phone with IMEI 355380099566223;

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

Case: 2:19-cr-00219-MJH   Document: 151   Filed: 04/18/22   Page: 9 of 9

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
           Sheet 6B    Schedule of Payments

Judgment — Page   9   of   9  

DEFENDANT:  MUSTAFA MOUSAB ALOWEMER
CASE NUMBER:  2:19-cr-00219-MJH-1

# ADDITIONAL FORFEITED PROPERTY

4) a Dell Inspiron 3670 computer, express service code: 2574745958; and 5) associated electronic storage media seized on June 19, 2019, during the search of the defendant's residence.

## NOTICE OF APPEAL TO
## UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

U.S. District Court - Western District of Pennsylvania (Pittsburgh)

Circuit Court Docket No. _____

FULL CAPTION IN DISTRICT COURT:

UNITED STATES OF AMERICA

v.

MUSTAFA MOUSAB ALOWEMER

District Court Docket No. 2:19-cr-219

District Court Judge Marilyn J. Horan

Notice is hereby given that MUSTAFA MOUSAB ALOWEMER appeals to the United States Court of Appeals for the Third Circuit from [x] Judgment; [ ] Order; [ ] Other (Specify)

_____

_____

entered in this action on November 10, 2022 .

DATED: November 22, 2022

/s/ Samuel G. Saylor
**(Counsel for Appellant-signature)**
Samuel G. Saylor
Assistant Federal Public Defender
**(Name of Counsel-Typed)**
1001 Liberty Avenue
**(Address)**
Suite 1500

Pittsburgh, PA 15222

(412) 644-6565
**(Tel. No. - FTS or Other)**

Laura Schleich Irwin
Assistant U.S. Attorney
**(Counsel for Appellee)**
4000 U.S. Courthouse
**(Address)**
700 Grant Street

Pittsburgh, PA 15219

(412) 644-3500
**(Tel. No. - FTS or Other)**

**Appx10**

# CERTIFICATE OF SERVICE

I hereby certify that the following is a filing user and will be served electronically through the Court's electronic docketing system (cm/ecf):

Laura S. Irwin, Esq.
Office of the United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219

***/s/ Sam Saylor***
Sam Saylor
Assistant Federal Public Defender

Dated:  May 12, 2023